## IN THE UNITED STATES COURT
## OF INTERNATIONAL TRADE

THE NATIONAL ASSOCIATION OF
MANUFACTURERS,

              Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
THE TREASURY,

UNITED STATES CUSTOMS AND
BORDER PROTECTION,

STEVEN T. MNUCHIN, *in his official
capacity as Secretary of the Treasury*,

and

JOHN SANDERS, *in his official capacity as Acting Commissioner of United
States Customs Border Protection*,

              Defendants.

No. 19-00053

## **COMPLAINT**

Plaintiff the National Association of Manufacturers (the "NAM") brings this complaint against Defendants United States Department of the Treasury ("Treasury"), United States Customs and Border Protection ("CBP"), Steven T. Mnuchin, in his official capacity as Secretary of the Treasury, and John Sanders, in his official capacity as Acting Commissioner of CBP, and alleges as follows:

**INTRODUCTION**

1.      Drawback—the refund or remission of duties, taxes, or fees paid on imported merchandise—has been part of U.S. customs law since the Nation's birth in 1789.  Since it was first enacted by Congress, drawback has been a critical tool to promote U.S. exports, and thus helps grow manufacturing, well-paying jobs, and stronger communities across the United States.  Recognizing these benefits, Congress has repeatedly expanded access to drawback, most recently in the Trade Facilitation and Trade Enforcement Act of 2015, known as "TFTEA."  Pub. L. No. 114-125, 130 Stat. 122 (2015).

2.      One such expansion is "substitution drawback," first added to the statute in 1984 and broadened by TFTEA in 2015.  Substitution drawback permits a refund of duties or taxes paid on imported merchandise when sufficiently similar "substitute merchandise" is exported or destroyed.  For example, a claimant who imported a case of wine produced abroad, having paid duties and excise taxes on the imported wine, could obtain a refund of those payments upon exporting a case of similar domestically produced wine.  Substitution drawback incentivizes U.S. exports, thereby benefiting U.S. businesses and boosting domestic manufacturing.

3.      TFTEA expanded this regime by clarifying and broadening the substitution standard.  Before, with limited exceptions for wine and petroleum products, merchandise could be substituted—and drawback claimed—only if the goods were "commercially interchangeable," a restrictive (and subjective) standard that effectively precluded many U.S. manufacturers from taking advantage of substitution drawback.  Now, a claimant can obtain a refund of federal duties or taxes paid on

imported merchandise if substitute merchandise carrying the same Harmonized Tariff Schedule (HTS) classification is exported (or destroyed under customs supervision) within five years.  19 U.S.C. § 1313(j)(2).  (Wine is subject to a special standard, first adopted in 2008, that allows substitution if the imported and exported wine "are of the same color" and within 50 percent of the same price, *id.*, and petroleum products have been eligible for HTS-based substitution since 1993, *id.* § 1313(p).)  TFTEA thus represents a significant expansion of substitution drawback that will benefit U.S. manufacturers—and boost employment—in many sectors.  That is because the only way for a company that has been importing merchandise—and paying federal excise taxes—to benefit from substitution drawback is to begin (or expand) domestic manufacturing, hire workers, and export substitute merchandise.

4.     However, as part of a rulemaking package belatedly implementing TFTEA, Defendants have promulgated a regulation that would impose a new, extra-statutory restriction on substitution drawback (the "Rule").  83 Fed. Reg. 64,942 (2018).  Under this new Rule, drawback of federal excise taxes paid on *imported* merchandise is limited to the amount of taxes paid (and not refunded or credited) on the *substitute* merchandise.  This new limitation has the intended effect of barring excise-tax drawback in most cases:  Many domestically produced goods, including beer, wine, spirits, tobacco, and petroleum products, are exempt from excise taxes if they are exported.  Thus, in the example above, the Rule would prohibit the draw-

back of *any* excise taxes paid on the imported wine because the substitute exported wine was untaxed.

5.     This is not the first time Defendants have tried to impose this restriction.  The Rule is materially identical to a 2009 proposal that Defendants withdrew in the face of widespread opposition, including from Members of both houses of Congress.  *See* 74 Fed. Reg. 52,928, 52,928 (2009).

6.     Defendants were right the first time.  The Rule flouts the statute, flouts the Administrative Procedure Act, and flouts the policy choices Congress made in adopting and expanding substitution drawback.

7.     *First*, the Rule is foreclosed by statute.  Drawback claims that meet TFTEA's requirements "shall" be paid "notwithstanding any other provision of law." 19 U.S.C. § 1313(j)(2).  And Defendants do not and cannot claim that the substitution-drawback provision is conditioned on the substitute merchandise's tax status. Instead, they assert that a different statutory provision imposes that condition.  *See id.* § 1313(v).  But that provision merely bars duplicative drawback claims under the customs laws.  It says nothing about tax-exempt exportations of domestic goods. Indeed, if Defendants' attempt to stretch this provision were accepted, the statute would prohibit substitution drawback not only of excise taxes but also of all duties or fees—an unjustifiable result that Defendants make no effort to defend.

8.     *Second*, the Rule is arbitrary and capricious.  An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Ve-*

*hicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It must not "rel[y] on factors which Congress has not intended it to consider." *Id.* And it may not "offer[] an explanation for its decision that runs counter to the evidence." *Id.* The Rule fails every one of these precepts. Defendants say the Rule is justified because excise-tax drawback does not meaningfully encourage exports and causes a significant loss of tax revenue. But key aspects of CBP's economic analysis are conclusory, inconsistent, or unsupported. As commenters explained—and as CBP failed to rebut—a proper analysis reveals that drawback does encourage exports and CBP's lost-revenue claims are grossly overstated.

9.      *Third*, the Rule contravenes Congress's policy choices. Even if Defendants' rationales for the Rule were adequately supported, Congress has chosen a different approach. It has consistently expanded substitution drawback and just as consistently rejected administrative or legislative attempts to impose the sort of restrictions Defendants now propose. It is not Defendants' place to countermand Congress's directives based on their own perception of the better policy.

10.     *Finally*, the Rule suffers from an independent flaw: It purports to apply to—and thus to foreclose—excise-tax drawback claims filed before the Rule took effect. That is an oxymoron. A rule cannot take effect before its effective date. And there is no basis to deny claims that satisfied every statutory requirement when filed. The rule is thus arbitrary, capricious, and unlawful to the extent it purports to reach backward in time. But the Court need not reach that issue if it concludes, as it should, that the Rule's drawback restriction is invalid.

11.    The Court should (i) vacate the Rule to the extent that it purports to limit substitution drawback to the amount of taxes paid (and not refunded) on the exported substitute merchandise; (ii) declare that the unambiguous statutory language forecloses Defendants' position; and (iii) permanently enjoin Defendants from enforcing this restriction.  If the Court concludes that the Rule is a permissible interpretation of the statute, it should hold the Rule invalid to the extent that it purports to apply to claims filed before the Rule's effective date.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction under 28 U.S.C. § 1581(i) because this is a "civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . revenue from imports or tonnage," "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue," or "administration and enforcement with respect to [those] matters."  28 U.S.C. § 1581(i)(1), (2), (4).  This action arises out of 19 U.S.C. § 1313, as amended by TFTEA, Pub. L. No. 114-125, 130 Stat. 122.  *See Tabacos de Wilson, Inc. v. United States*, 324 F. Supp. 3d 1304, 1309–10 (C.I.T. 2018).

13.    Because this case falls within § 1581's grant of exclusive jurisdiction, this Court is the sole venue for this action.

## PARTIES AND STANDING

14.    The NAM is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 States.  Manufacturing employs more than 12 million men and women,

contributes $2.25 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for more than three-quarters of all private-sector research and development in the nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

15.     Many of the NAM's members will be injured and aggrieved by the Rule's restriction on substitution drawback. They include both manufacturers that would be able to claim substitution drawback absent the Rule, like Diageo North America, Pernod Ricard USA, and Sazerac Company, and tax-recovery services that will lose business filing drawback claims as a result of the Rule, like Charter Brokerage. Some of the NAM's members have also made investments to expand their U.S. manufacturing capacity based on their expectation of receiving substitution drawback of excise taxes. If the Rule is upheld, these investments—and the jobs they support—will likely be lost.

16.     *Diageo North America.* Diageo globally is the world's largest manufacturer of distilled spirits, with over 200 brands and over 100 manufacturing sites across 30 countries. Diageo North America's manufacturing arm, Diageo Americas Supply, Inc., produces 49 million cases of premium beverage alcohol across major U.S. production sites in Plainfield, Illinois; Shelbyville, Kentucky; Tullahoma, Tennessee; and Relay, Maryland. These products include well-known brands like Bulleit bourbon, Smirnoff vodka, Guinness beer, and Captain Morgan rum products. Diageo is a NAM member.

17.     Relying on TFTEA's expanded substitution standard, Diageo began testing to manufacture a key global brand at one of its U.S. production sites for the global export market.  Diageo then significantly increased production of this brand in the U.S. for export, which generated excise-tax drawback claims that Diageo submitted to CBP.  CBP has not paid those claims, apparently relying on the legal interpretation underlying the Rule.  This activity required a substantial investment to upgrade and test equipment and materials, and also required Diageo to bear the significant additional costs of producing in the United States.

18.     Based on the publication of the Rule, however, Diageo has suspended additional production of this product in the United States and has discontinued plans to further increase domestic production by millions of cases annually.  If the Rule is invalidated, Diageo will resume those plans, increase U.S. production, and file excise-tax drawback claims under TFTEA.

19.     *Pernod Ricard USA.*  Pernod Ricard USA (PRUSA) is a premium wine and spirits company with production facilities and offices throughout the United States, including in Arkansas, California, Texas, Illinois, and New York.  PRUSA's Arkansas facility blends, bottles, and distributes multiple Pernod Ricard brands to customers across the globe.  In fact, 40 percent of the Arkansas facility's production volume goes to export markets.  The vast majority of these export volumes is driven by brands such as Kahlua, Malibu, Seagram's Gin, and 100 Pipers scotch whiskey.  PRUSA's current export markets include Brazil, Spain, Japan, Germany, Australia, Thailand, and China.  PRUSA is a NAM member.

20.    PRUSA has already invested several million dollars to increase its manufacturing capacity and increase export volumes in the Arkansas facility, and it has the capacity to add an additional 50 percent or more in volume.  A significant amount of additional production could thus be transitioned from other global sites to the United States, along with the jobs to support that production and distribution.  TFTEA drawback legislation provides an important catalyst to pursue this strategy by increasing PRUSA's production for export markets.  But if PRUSA is unable to obtain drawback based on these export volumes, there is no business rationale for these capital-intensive changes, PRUSA will be unable to fully recoup its significant investment, and U.S. manufacturing jobs created for these export volumes would be negatively impacted.

21.    *Sazerac Company.*  Sazerac Company is a privately held, family-owned company headquartered in Louisville, Kentucky.  Sazerac was founded in 1919 and has grown to become one of the largest spirits companies in the world, with over 2,200 employees, and a significant employer in communities throughout the United States.  It operates distilleries and bottling plants throughout the United States, including in Louisiana, Kentucky, Virginia, Indiana, Tennessee, Maine, New Hampshire, Maryland, and California.  It also has operations around the world. Sazerac's products include iconic American brands such as Buffalo Trace Kentucky Straight Bourbon Whiskey, Fireball Cinnamon Whiskey, and Eagle Rare Bourbon Whiskey.  Sazerac is a NAM member.

22.     As one of the largest spirit companies in the world, a substantial domestic producer of liquors, wine, and cocktail products, and a significant importer and exporter of those products, a significant portion of Sazerac's business is subject to federal excise taxes.  For example, Sazerac produces Fireball Cinnamon Whiskey in both the United States and Canada.  Sazerac has invested significantly in expanding its production of Fireball Cinnamon Whiskey at the Company's Lewiston, Maine distillery to take advantage of excise-tax drawback on its imports of Canadian-produced Fireball Cinnamon Whiskey.  If allowed to stand, the Rule will derail these investments—and the badly needed economic development and opportunities in Lewiston.  It will also deter Sazerac from expanding its production at other U.S. manufacturing facilities to support increased exports, such as in New Albany, Indiana.

23.     *Charter Brokerage.*  Charter Brokerage is a Licensed Customs Broker, founded in 1994.  Charter has 125 employees at four locations in the United States (New York, New York; Katy, Texas; Norwalk, Connecticut; and Miramar, Florida).  Charter provides import/export services for a wide variety of customers, including import/export clearance, duty drawback, and Foreign Trade Zone operations.  The largest segment of Charter's business is duty drawback. Duty drawback services accounted for approximately 67% of Charter's total revenues in 2018. Charter is compensated for drawback services through a percentage of the refunds it obtains for its customers. Charter is paid only if drawback refunds are paid.  Charter is a NAM member.

24. Charter's drawback customers include U.S. manufacturers of beer, wine, and spirits. In 2018, about 28% by value of drawback claims filed by Charter were TFTEA substitution drawback claims for beer, wine, and spirits. But all of the exports that served as the basis for these drawback claims would be ineligible for excise tax recovery under the Rule. Excise tax recovery represents more than 99% of the total drawback recovery claimed by Charter on these products in 2018. If the Rule is upheld, Charter will be unable to recover nearly all duties, taxes, and fees paid on its clients' imported products, and Charter's revenues—based on percentage of recovery—will similarly be cut.

25. Charter has staff dedicated to beer, wine, and spirits customers. If the new regulation is upheld, this staff either will need to be repurposed or will become unnecessary. In addition, Charter has already invested substantially in developing processes, assembling data, and filing drawback claims for beer, wine, and spirits excise tax recovery before the effective date of the Rule. None of the TFTEA claims has been processed by CBP. If CBP were to reject excise tax recovery for the TFTEA claims filed before the effective date of the Rule, Charter's fees would be negligible, and would be completely insufficient to recover its costs incurred in providing the services it has already performed.

26. Defendants Treasury and CBP are agencies of the United States government.

27. Defendant Steven T. Mnuchin is the Secretary of the Treasury. He is sued in his official capacity only.

28.     Defendant John Sanders is Acting Commissioner of CBP.  He is sued in his official capacity only.

## STATUTORY AND REGULATORY BACKGROUND

29.     The Internal Revenue Code imposes excise taxes on various goods produced in or imported into the United States.  Spirits, beer, wine, tobacco products, and petroleum products are all subject to excise taxes.  But, in accordance with the constitutional rule that "No Tax or Duty shall be laid on Articles exported from any State," U.S. CONST. art. I, § 9, cl. 5, excise taxes do not attach to exported goods. For example, distilled spirits may be exported "without payment of tax," and any taxes paid before exportation may be refunded.  26 U.S.C. §§ 5062(b), 5214(a)(4). Likewise, excise taxes paid on imported spirits, wines, or beer can be refunded if those products are re-exported.  *Id.* § 5062(c).  Only the refund of taxes already paid is described in the tax code as a "drawback."

30.     Substitution drawback is governed by 19 U.S.C. § 1313(j)(2).   As amended by TFTEA (and apart from certain irrelevant exceptions), paragraph (j)(2) sets forth specific conditions for substitution drawback:

> [I]f there is, with respect to imported merchandise on which was paid any duty, tax, or fee imposed under Federal law upon entry or importation, any other merchandise (whether imported or domestic), that—
>
> > (A) is classifiable under the same 8-digit HTS subheading number as such imported merchandise;
> >
> > (B) is [within 5 years] . . . either exported or destroyed under customs supervision; and
> >
> > (C) before such exportation or destruction—
> >
> > > (i) is not used within the United States, and
> > >
> > > (ii) is . . . under the operational control of, the party claiming drawback under this paragraph, . . .

then, notwithstanding any other provision of law, upon the exportation or destruction of such other merchandise an amount calculated pursuant to regulations prescribed by the Secretary of the Treasury under subsection (*l*) shall be refunded as drawback.

19 U.S.C. § 1313(j)(2).

31.     Paragraph (j)(2) thus states three conditions to obtain substitution drawback: (1) there must be "imported merchandise on which was paid any duty, tax, or fee imposed under Federal law upon entry or importation" (excise taxes, for instance); (2) there must be "any other merchandise . . . classifiable under the same 8-digit HTS subheading number"; (3) and the other merchandise must be exported or destroyed within five years, must not be used, and must be within the claimant's control.  *Id.*  (As noted above, wine is subject to a special substitution standard based on color and value, *see id.*)  If these three conditions are met, a refund is mandatory:  "an amount calculated pursuant to regulations prescribed by the Secretary of the Treasury under subsection (*l*) shall be refunded as drawback," "*notwithstanding any other provision of law.*"  *Id.* (emphasis added).  In turn, subsection (*l*) says that CBP's regulations "shall" provide for substitution drawback "equal to 99 percent of the lesser of" the charges paid for the imported merchandise or the charges that would apply to the exported merchandise if it were imported.  *Id.* § 1313(*l*)(2).

32.     Subsection 1313(v) is titled "Multiple drawback claims."  It provides that "[m]erchandise that is exported or destroyed to satisfy any claim for drawback shall not be the basis of any other claim for drawback."  19 U.S.C. § 1313(v).  For

example, under subsection 1313(v), a manufacturer may not claim substitution drawback for two cases of imported wine based on the same case of exported wine.

33.     Consistent with these provisions, CBP's regulations have long defined "drawback" to mean "the refund or remission, in whole or in part, of a customs duty, fee or internal revenue tax which was imposed on imported merchandise under Federal law." 19 C.F.R. § 191.2(i). They likewise define "drawback claim" to mean "the drawback entry and related documents required by regulation," and in turn define "drawback entry" to mean "a description of, and other required information concerning, the exported or destroyed article," which is "filed on Customs Form 7551." 19 C.F.R. § 191.2(j)–(k). Thus, a "drawback claim" is merely a claim filed on a customs form for a refund of a charge imposed on imported merchandise.

34.     In 2007, Congress considered a pair of statutory amendments that would have reduced substitution drawback payments "by an amount equal to any Federal tax credit or refund of any Federal tax" on the substitute goods. 153 Cong. Rec. S7909, S7941, § 832(b); *accord* 153 Cong. Rec. S13774, S13927, § 12318(b). It rejected them.

35.     In 2009, as noted above, Defendants proposed to bar substitution drawback "for internal revenue excise tax paid on imported merchandise in situations where no excise tax was paid upon the substituted merchandise or where the substituted merchandise is the subject of a different claim for refund or drawback of tax under" the tax code. 74 Fed. Reg. at 52,928. Defendants claimed, as they argue now, that allowing drawback in this situation would improperly permit "'piggyback-

14

ing' a previously existing Federal excise tax exemption benefit . . . onto the draw-back benefits" of § 1313. *Id.* at 52,930. But after significant opposition—including from legislators in both houses of Congress—Defendants withdrew the proposal.

**THE RULE**

36.   Although TFTEA was enacted in 2015, claimants could not begin filing claims under the expanded drawback regime until February 24, 2018. *See* 19 U.S.C. § 1313(*l*)(2)(A), (*l*)(3), (r)(4). The statute thus required Defendants to issue regulations providing for drawback under the new regime by that date. *See id.* § 1313(l)(2)(A). They failed to do so. Instead, CBP issued interim guidance that allowed TFTEA drawback claims to be electronically filed, but stated CBP's view that those claims would be governed by the yet-to-be-issued regulations: "After the finalized regulations are implemented, claims that were filed during the interim period"—February 24, 2018 to February 19, 2019—"must be perfected and corrected as necessary to comply with the finalized regulations." U.S. Customs & Border Protection, *Drawback: Interim Guidance for Filing TFTEA Drawback Claims* at 7 (Version 3, March 2018). Thus, although manufacturers (including the NAM's members) have been filing drawback claims under TFTEA's expanded substitution standard since February 2018, CBP has not acted on any of those claims. Nor is it clear what, if anything, will be required to "perfect" these claims. This has created a substantial backlog and economic burden on the NAM's members.

37.   In August 2018, Defendants finally issued a notice of proposed rule-making to implement TFTEA's drawback provisions. This proposal included a re-

striction on excise-tax drawback identical to the one that Defendants proposed—and then withdrew in the face of widespread resistance—in 2009:

> For purposes of drawback of internal revenue tax imposed under Chapters 32, 38, 51, and 52 of the Internal Revenue Code . . . drawback granted on the export or destruction of substituted merchandise will be limited to the amount of taxes paid (and not returned by refund, credit, or drawback) on the substituted merchandise.

83 Fed. Reg. 37,886, 37,932 (2018); *accord* 74 Fed. Reg. at 52,931 (2009 proposal). But now, this failed proposal has been rebranded:  Defendants claim this restriction is needed to prevent what they call "double drawback"—a term found nowhere in the customs laws, which they seem to have coined for this rulemaking.

38.    Defendants offered two justifications for this prohibition on so-called "double drawback."  *First*, they said it is required by subsection 1313(v), which as explained above prohibits multiple drawback claims based on the same substitute merchandise.  83 Fed. Reg. at 37,895.  *Second*, they argued that this restriction is good policy because (a) excise-tax drawback supposedly does not encourage exports and (b) the Treasury would forgo significant revenue by allowing excise-tax drawback under TFTEA's broader substitution standard.  *Id*. at 37,896–37,901.

39.    Many commenters, including the NAM and some of its members, opposed the proposal.  The NAM explained that Defendants' interpretation clashed with the clear statutory text, the statutory structure, the history of the drawback regime, and the longstanding regulatory definitions of "drawback" and "drawback claim."  The NAM also observed that Congress has considered and rejected precisely the sort of restriction the Rule would impose—and that for years CBP has paid ex-

cise-tax drawback for wine and petroleum products.  And the NAM explained in detail, with a supporting report by an expert economist, that Defendants' export-incentive and revenue-loss theories were just that—theories, unsupported by the evidence and inconsistent with proper economic analysis.

40.    Defendants issued the final Rule in December 2018.  83 Fed. Reg. 64,942.  The final Rule made just one relevant change to the proposed regulatory text.  Apparently recognizing the force of commenters' arguments that the proposed restriction was inconsistent with CBP's longstanding definitions of "drawback" and "drawback claim," Defendants transformed both definitions by tacking on this sentence:  "More broadly, drawback also includes the refund or remission of other excise taxes pursuant to other provisions of law."  *Id*. at 64,998.  (Defendants also altered the language of the excise-tax restriction to permit drawback of oil spill liability taxes, *id*. at 64,962–63.)  Defendants otherwise rejected the comments explaining the Rule's fatal legal flaws and the challenges to their statistical and economic analysis.

41.    The final Rule provides that the "effective date for amendments regarding the drawback of excise taxes"—that is, for the provisions relevant here—"is February 19, 2019."  83 Fed. Reg. at 64,942.  But the preamble reiterates Defendants' view, stated in CBP's interim guidance, that the Rule governs claims filed before that date—and even before the Rule was proposed.  As noted above, there is a substantial backlog of claims filed under TFTEA that CBP has neither paid nor denied.  Although these claims were filed after TFTEA took effect—and well before

the Rule did—the preamble describes them as "interim" claims that must now be "perfect[ed]" (and presumably denied) under the Rule.  83 Fed. Reg. at 64,942–43.

## CLAIMS FOR RELIEF

### Count I:  Administrative Procedure Act
### (5 U.S.C. §§ 701–706)

42.     The NAM incorporates by reference the allegations in the paragraphs above.

43.     The Rule is reviewable under the APA because it is a final agency action under 5 U.S.C. § 704.

44.     A court reviewing agency action under the APA shall (i) "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," and (ii) "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  The Rule should be vacated for multiple reasons.

45.     *First*, the Rule should be set aside because the statute unambiguously forecloses it.  Paragraph 1313(j)(2) requires drawback of "*any* duty, tax, or fee imposed under Federal law upon entry or importation" upon the exportation of "*any* other merchandise," "notwithstanding any other provision of law."  This language requires drawback of federal excise taxes without regard to the tax status of the substitute goods; indeed, it expressly overrides any contrary restriction.

46.     Defendants do not and cannot claim that paragraph 1313(j)(2) imposes any restrictions based on the substitute merchandise's tax status.  Nor can they dispute that drawback claims that meet paragraph (j)(2)'s requirements "shall" be paid "notwithstanding any other provision of law."  *Id.*  Even so, they claim that "[an]other provision of" § 1313, subsection (v), prohibits substitution drawback where the substitute merchandise is exported without taxation.

47.     Subsection (v), however, merely prohibits multiple "claim[s] for drawback" under section 1313 *based on the same substitute merchandise.*  There is, by contrast, no "claim" and no "drawback" where domestic merchandise is simply exported "without payment of tax."  *E.g.*, 26 U.S.C. § 5214(a)(4).  That conclusion follows from the relevant tax-code provisions; from the longstanding regulatory definitions of these terms, against which Congress has legislated; and from the legislative history, which shows that Congress has consistently expanded substitution drawback and just as consistently rejected efforts to restrict it—including by rejecting precisely the restriction Defendants now seek to impose by regulation.

48.     The consequences of Defendants' interpretation underscore that it cannot be correct.  To begin with, CBP has allowed substitution drawback for excise taxes on wine and petroleum products for years, which would be illegal if CBP's interpretation were correct.  On top of that, if Defendants were right that every tax-exempt exportation is a "claim for drawback," subsection (v) would not merely prohibit substitution drawback of excise taxes; it would bar "*any other* claim for draw-

back" based on the same exported goods, *see* 19 U.S.C. § 1313(v) (emphasis added)—
including claims for customs duties or fees, which do not even apply to exports.

49.     The final Rule's preamble confirms all of this.  Although Defendants
acknowledge that the tax code does not use the word "drawback" to describe all of
the tax-exempt exportations that the Rule would cover, they declare that "Con-
gress's inconsistent use of the term 'drawback'" is no obstacle, since all tax-exempt
or tax-refunded transactions "are identical in economic substance."  83 Fed. Reg. at
64,961.  But the absence of the term "drawback" from the relevant provisions in the
tax code is not "inconsistent"; it is on purpose.  Defendants are not free to treat var-
ied statutory provisions identically.  *See Elonis v. United States*, 135 S. Ct. 2001,
2008 (2015) (courts presume that "Congress acts intentionally" when it "includes
particular language in one section of a statute but omits it in another section of the
same Act").

50.     Defendants' belatedly reworked definitions of "drawback" and "draw-
back claim" do not rescue their proposal.  The new definitions still require a "refund
or remission" of tax, 83 Fed. Reg. at 64,998, and neither occurs when goods are ex-
ported before any tax has been "paid or determined," *e.g.*, 26 U.S.C. § 5214(a)(4).  In
any event, these new definitions are inconsistent with the broader drawback regime
and Congress's intent, and are thus *ultra vires* for the same reasons the Rule is in-
valid.

51.     Finally, Defendants dispute that their interpretation of subsection (v)
would prohibit drawback of taxes *and duties*, asserting that the multiple-claim pro-

hibition can be applied "*within* each class" of exaction. 83 Fed. Reg. at 64,962. But subsection (v) simply cannot be read as Defendants assert. Once triggered, this provision categorically prohibits "*any other* claim for drawback." For these reasons and more, the statute unambiguously forecloses Defendants' interpretation.

52. Even if the relevant statutory language were ambiguous in some respect, the Rule would not reflect a reasonable construction. Every relevant indicator of congressional intent—including the language Congress used and the language it *didn't* use, as well as the changes Congress made and those it *didn't* make— shows that Congress meant to permit substitution drawback for all manner of federal charges, including excise taxes, and did not intend § 1313(v) to reach across statutory regimes to impose the sort of restriction Defendants assert. Indeed, Congress has consistently rejected attempts, both legislative and administrative, to impose such a restriction. The agency cannot use a regulation to do what Congress deliberately decided not to do.

53. *Second*, the Rule is arbitrary and capricious. Defendants assert that the Rule is justified because (a) trade statistics show that drawback of excise taxes does not meaningfully encourage exports and (b) permitting drawback in these cases would result in a significant loss of tax revenue. But neither premise is supported by the available evidence or by basic economics.

54. For example, CBP's conclusion that excise-tax drawback does not incentivize exports depends on an analysis of wine exports from 2004 to 2016. But CBP conflates low-priced bulk wine with high-priced bottled wine, which (as CBP

elsewhere acknowledges) are subject to vastly different incentives based on price differences. The same analysis also fails to examine data from before 2004—the year CBP says it started granting excise-tax drawback on wine—in violation of the basic principle that assessing the impact of a policy change requires a comparison of data from before and after the change. And CBP's revenue-loss claims depend largely on the idea that, if excise-tax drawback is permitted, companies will produce product solely to destroy it to take advantage of drawback. But it provided no evidence that this practice occurs or plausibly could occur. These are just some of the fundamental flaws in CBP's economic analysis.

55. *Third*, the Rule is directly contrary to Congress's policy choices, as embodied in the statutory text both enacted and rejected. Since it first adopted substitution drawback in 1984, Congress has consistently rebuffed efforts to artificially constrain the program—including by rejecting legislative proposals that mirrored the Rule's restriction—and just as consistently expanded the program's availability. In particular, Congress clarified in 2004 that substitution drawback reaches all federal taxes, and in 2015 broadened the substitution standard through TFTEA. This history reflects Congress's consistent policy judgment that substitution drawback is a boon for U.S. manufacturing, and that any accompanying loss of tax revenue is a fair price to pay for those substantial benefits. Notably, Congress deliberately expanded substitution drawback under TFTEA six years *after* CBP acknowledged that it had been paying excise-tax drawback on wine and petroleum for years and tried

unsuccessfully to end the practice.  Defendants cannot depart from Congress's scheme based on their contrary view of good policy.

56.    The Court should therefore hold unlawful and vacate the Rule to the extent that it purports to limit drawback granted on the export or destruction of substituted merchandise to the amount of taxes paid (and not returned by refund, credit, or drawback) on the substituted merchandise.  That includes Defendants' belated expansions of the definitions of "drawback" and "drawback claim."

57.    Separately, Defendants' attempt to apply the Rule to drawback claims filed under TFTEA before the Rule's February 19, 2019 effective date is improper. If those claims complied with the statutory requirements specified by Congress when they were filed, Defendants cannot now deny them based on a regulation that was not even proposed, much less in effect, until months later.  Nor is there a legal basis to grant only some of these claims, when there was no agency regulation governing this issue for any commodity.  *See* 83 Fed. Reg. at 64,960 (suggesting that CBP may grant excise-tax drawback claims for wine, but not other goods, filed before the Rule's effective date).  Thus, even if the Rule is not categorically invalid, Defendants' attempt to apply it to previously filed claims is arbitrary, capricious, and unlawful.  But the Court need not reach this issue if it concludes, as it should, that the statue forecloses Defendants' interpretation.

**Count II:  Administrative Procedure Act
and Declaratory Judgment Act
(5 U.S.C. §§ 701–706, 28 U.S.C. §§ 2201–2202)**

58.    The NAM incorporates by reference the allegations in the paragraphs above.

59.    The Court may declare the legal rights and obligations of the parties under 28 U.S.C. §§ 2201 and 2202 because this action presents an actual controversy within the Court's jurisdiction.

60.    The NAM's members are, and will continue to be, injured and aggrieved by the Rule's restriction on substitution drawback.

61.    For the reasons explained above, the Rule is unlawful and invalid.  In particular, the unambiguous statutory language belies Defendants' claim that subsection 1313(v) prohibits substitution drawback of excise taxes where the substitute merchandise was exported without taxation.

62.    The NAM is therefore entitled to a judgment declaring that: (a) 19 U.S.C. § 1313's unambiguous language does not condition substitution drawback on the tax status of the substitute merchandise, and (b) the Rule is invalid and without effect to the extent that it purports to limit drawback granted on the export or destruction of substituted merchandise to the amount of taxes paid (and not returned by refund, credit, or drawback) on the substituted merchandise.

63.    If the Court does not hold that the Rule's restriction on excise-tax drawback is impermissible, it should declare that this restriction cannot be applied to claims filed before the Rule's effective date.

## PRAYER FOR RELIEF

The NAM asks that the Court enter judgment in its favor and:

A.      Hold unlawful and vacate the Rule to the extent that it purports to limit drawback granted on the export or destruction of substituted merchandise to the amount of taxes paid (and not returned by refund, credit, or drawback) on the substituted merchandise;

B.      Declare that 19 U.S.C. § 1313's unambiguous language does not permit CBP to condition substitution drawback on the tax status of the substitute merchandise, and declare that CBP should immediately process all validly filed claims for drawback under TFTEA;

C.      Declare that the Rule is invalid and without effect to the extent that it purports to limit drawback granted on the export or destruction of substituted merchandise to the amount of taxes paid (and not returned by refund, credit, or drawback) on the substituted merchandise; and

D.      Permanently enjoin the enforcement of the Rule to the extent that it purports to limit drawback granted on the export or destruction of substituted merchandise to the amount of taxes paid (and not returned by refund, credit, or drawback) on the substituted merchandise; or

E.      If the Court concludes that the Rule is a permissible interpretation of the statute, hold unlawful and vacate the Rule, and declare that the Rule is invalid and without effect, to the extent that it purports to limit drawback claims filed before the Rule's effective date;

F.     Award the NAM its costs and expenses, including reasonable attorney's fees; and

G.     Provide such other and further relief as the Court deems just.


April 17, 2019                                   Respectfully submitted,


                                                 /s/ Peter. D. Keisler
Catherine E. Stetson                             Peter D. Keisler
Susan M. Cook                                    Virginia A. Seitz
HOGAN LOVELLS US LLP                             Richard M. Belanger
Columbia Square                                  Tobias S. Loss-Eaton
555 Thirteenth Street NW                         Barbara Broussard
Washington, DC 20004                             SIDLEY AUSTIN LLP
(202) 637-5491                                   1501 K Street NW
cate.stetson@hoganlovells.com                    Washington, DC 20005
                                                 (202) 736-8000
Peter C. Tolsdorf                                pkeisler@sidley.com
Leland P. Frost
MANUFACTURERS' CENTER
  FOR LEGAL ACTION
733 10th Street NW, Suite 700
Washington, DC 20001
(202) 637-3000


*Counsel for Plaintiff National Association of Manufacturers*

## PROOF OF SERVICE

Under this Court's Rule 4(k), I hereby certify that, on April 17, 2019, I caused

copies of the foregoing SUMMONS and COMPLAINT to be served by certified mail,

return receipt requested, on:

Attorney-in-Charge
U.S. Department of Justice,
Civil Division, Commercial Litigation Branch
International Trade Field Office
26 Federal Plaza, Room 346
New York, New York 10278

Brent J. McIntosh, Esq.
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Ave. NW
Washington, D.C. 20220

Scott K. Falk, Esq.
Chief Counsel
U.S. Customs and Border Protection
1300 Pennsylvania Ave. NW
Washington, DC 20229

I declare under penalty of perjury that the foregoing is true and correct.  Exe-

cuted on April 17, 2019.


/s/  Peter D. Keisler
Peter D. Keisler